**UNITED STATES of America,
Plaintiff,**

v.

**Roger WALDNER, Defendant.**

**No. 06–CR–1019–LRR.**

United States District Court,
N.D. Iowa,
Eastern Division.

July 7, 2008.

Raphael M. Scheetz, Scheetz Law Office, Cedar Rapids, IA, for Defendant, Richard Martin.

Matthew J. Cole. U.S. Attorney's Office, Cedar Rapids, IA, for Plaintiff.

**SENTENCING MEMORANDUM**

LINDA R. READE, Chief Judge.

## TABLE OF CONTENTS

I. INTRODUCTION ...................................................917

II. RELEVANT PROCEDURAL BACKGROUND ...............................917
 A. Indictment .................................................917
 B. "Eleventh Hour" Plea Agreement .............................918
 C. Sentencing .................................................919

III. SENTENCING FRAMEWORK .........................................920

IV. FINDINGS OF FACT ..............................................921
 A. Outline of Defendant's Fraudulent Scheme ...................921
 1. H & W ...................................................921
 2. Defendant's fraudulent scheme ...........................921
 3. Baron's role ............................................922
 B. Ongoing Efforts: Lex, Schueller & Eide .....................923
 1. Lex .....................................................923
 2. Schueller ...............................................926
 3. Eide ....................................................926

V. PRIMARY LEGAL ISSUES ..........................................928

VI. PRE–DEPARTURE ADVISORY SENTENCING GUIDELINES RANGE .....928
 A. Amount of Loss—USSG § 2B1.1(b)(1)(I) .......................928
 1. Law .....................................................929
 2. Arguments ...............................................929
 3. Analysis ................................................931
 4. Conclusion ..............................................933
 B. Number of Victims— § 2B1.1(b)(2)(B) ........................933
 C. "Sophisticated Means"—USSG § 2B1.1(b)(8)(C) ................934
 D. Abuse of a Position of Private Trust—USSG § 3B1.3 ..........935
 E. Obstruction of Justice—USSG § 3C1.1 ........................937
 1. Thompson Motors .........................................937
 2. Post–Plea Proffer .......................................938
 3. Disposition .............................................938
 F. Acceptance of Responsibility–USSG § 3E1.1 ..................938
 G. Pre–Departure Advisory Sentencing Guidelines Range ........939

VII. TRADITIONAL DEPARTURES .......................................939
 A. General Principles .........................................940
 B. Downward Departure–USSG § 5K2.0 ............................940
 C. Upward Departures ..........................................941
 1. USSG § 5K2.3—Extreme Psychological Injury ...............941
 2. USSG § 5K2.5—Property Damage or Loss ...................942
 3. USSG § 5K2.9—Criminal Purpose ..........................943

 4. *USSG § 5K2.21—Dismissed and Uncharged Conduct* ...............943
 D. **Final Advisory Sentencing Guidelines Range** .........................944

VIII. **SENTENCE AND RESTITUTION** .......................................944
 A. **18 U.S.C. § 3553(a)** .............................................944
 B. **Restitution** ...................................................945

IX. *CONCLUSION* .................................................945

## I. INTRODUCTION

The matter before the court is the sentencing of Defendant Roger Waldner.

## II. RELEVANT PROCEDURAL BACKGROUND

### A. Indictment

On May 10, 2006, a grand jury returned a twelve-count Indictment (docket no. 2) against Defendant. Each count charged Defendant with knowingly and fraudulently making a false statement under penalty of perjury in relation to a bankruptcy proceeding, in violation of 18 U.S.C. § 152(3).[1]

Count 1 charged that, on or about June 27, 2002, Defendant knowingly and fraudulently made the false statement in *In re H & W Motor Express Co.*, No. 02–2017 (Bankr.N.D.Iowa Jun. 12, 2002) ("*H & W Motor Express*") under penalty of perjury that there were no "payments made within one year immediately preceding the commencement of the bankruptcy case to or for the benefit of creditors who are or were insiders." In truth, H & W Motor Express Co. ("H & W") paid over $1.8 million to or for the benefit of creditors who were or had been insiders.

Count 2 charged that, on or about June 27, 2002, Defendant knowingly and fraudulently made the false statement in *H & W Motor Express* under penalty of perjury that there were "no inventories taken of the property of H & W." In truth, Defen-

dant had ordered others to take an inventory of H & W's property in 2001.

Count 3 charged that, on or about June 27, 2002, Defendant knowingly and fraudulently made the false statement in *H & W Motor Express* under penalty of perjury that there were no "distributions credited or given to an insider, including compensation in any form," in the one year immediately preceding the commencement of *H & W Motor Express.* In truth, H & W had paid Defendant in the form of stock positions with Nationwide Cartage ("Nationwide") and Solace Transfer ("Solace"), as compensation in lieu of a salary.

Count 4 charged that, on or about June 27, 2002, Defendant knowingly and fraudulently made the false statement in *H & W Motor Express* under penalty of perjury that H & W had no office equipment, furnishings or supplies. In truth, H & W had office equipment, furnishings and other supplies in its various offices and terminals.

Count 5 charged that, on or about June 27, 2002, Defendant knowingly and fraudulently made the false statement in *H & W Motor Express* under penalty of perjury that H & W had no machinery, fixtures, equipment or supplies used in its business. In truth, H & W had machinery, fixtures, equipment and supplies used in its business at its various offices and terminals.

Count 6 charged that, on or about June 27, 2002, Defendant knowingly and fraudulently made the false statement in *H & W Motor Express* under penalty of perjury

---

**1.** It is a felony to "knowingly and fraudulently make[ ] a false ... statement under penalty of

perjury ... in ... any case under [T]itle 11...." 18 U.S.C. § 152(3).

that H & W had no inventory. In truth, H & W had an inventory of parts and equipment, which it used to maintain its fleet of trucks and trailers.

Count 7 charged that, on or about July 18, 2002, Defendant knowingly and fraudulently made the false statement in *H & W Motor Express* under penalty of perjury that H & W "didn't own any equipment." In truth, H & W had an inventory of parts and equipment, which it used to maintain its fleet of trucks and trailers.

Count 8 charged that, on or about July 18, 2002, Defendant knowingly and fraudulently made the false statement in *H & W Motor Express* under penalty of perjury that he "never took any wages or salaries or anything else from the day [he] walked in the door there [at H & W]." In truth, Defendant received compensation from H & W in the form of stock positions with Nationwide and Solace in lieu of a salary.

Count 9 charged that, on or about July 18, 2002, Defendant knowingly and fraudulently made the false statement in *H & W Motor Express* under penalty of perjury that Solace had "no relation at all" with H & W. In truth, H & W and Solace had some common officers and directors. Further, Defendant was the CEO and owner of both H & W and Solace.

Count 10 charged that, on or about July 18, 2002, Defendant knowingly and fraudulently made the following false statement in *H & W Motor Express* under penalty of perjury: "I don't know [what STRAC was]." In truth, Defendant formed STRAC on June 15, 2001. He also signed a resolution by the Board of Directors of H & W regarding paying $100,000 for a feasibility study for STRAC to acquire Midland Transportation Co. ("Midland").

Count 11 charged that, on or about July 18, 2002, Defendant knowingly and fraudulently made the following false statement in *H & W Motor Express* under penalty of perjury: "I have no ownership or affiliation with Nationwide." In truth, Defendant formed Nationwide on August 10, 2001, Nationwide and H & W shared the same office address and Defendant was CEO of Nationwide.

Count 12 charged that, on or about July 18, 2002, Defendant knowingly and fraudulently made the false statement in *H & W Motor Express* under penalty of perjury that he was "not aware" of any common officers between Solace, Nationwide and H & W. In truth, Defendant was an officer and director of Solace, Nationwide and H & W, and "G.S." was an officer of Solace, Nationwide and H & W.

### B. *"Eleventh Hour" Plea Agreement*

On May 18, 2007, Defendant appeared before a United States Magistrate Judge for jury selection. On May 21, 2007, after the jury was selected but before opening statements, Defendant appeared before the undersigned and pled guilty to Counts 11 and 12 of the Indictment. Defendant pled guilty pursuant to a plea agreement ("Plea Agreement") (docket no. 49–2). In the Plea Agreement, Defendant stipulated to the following facts:

A. On June 12, 2002, [H & W] filed a petition for bankruptcy, under Chapter 11, in the United States Bankruptcy Court for the Northern District of Iowa [ ("Bankruptcy Court") ]. On June 27, 2002, [H & W] filed its Statement and Schedules [ ("Schedules") ] in support of its bankruptcy petition. The petition and Schedules were signed by [Defendant], as owner and [CEO] of [H & W].

B. On July 18, 2002, the Bankruptcy Court convened a First Meeting of Creditors [ (" § 341 Meeting") ], during which [Defendant] appeared on behalf of [H & W] as its owner

and [CEO]. The [§ 341 Meeting] took place ... in the Northern District of Iowa. [Defendant] testified under oath and penalty of perjury during [§ 341 Meeting] on July 18, 2002.

C. During the [§ 341 Meeting], on July 18, 2002, [D]efendant stated under penalty of perjury: "I have no ownership or affiliation with Nationwide." In truth and in fact, [D]efendant was president and CEO of One Stop, Inc. [ ("One Stop") ], a South Dakota corporation, which did business as and owned the assets of Nationwide. Defendant knew that his statement was false at the time he made it, and was a materially false statement. Disassociating H & W from Nationwide may have prevented creditors from seeking to satisfy H & W debts from the assets of Nationwide, and therefore [D]efendant intended to defraud creditors by making the false statement.

D. During the [§ 341 Meeting], on July 18, 2002, [D]efendant stated under penalty of perjury that he was not aware of any connection of officers between Solace, Nationwide and H & W. In truth and in fact, [D]efendant was the CEO of H & W and president and CEO of [One Stop, which] owned the assets and did business as Nationwide and Solace. Defendant knew that his statement was false at the time he made it, and was a materially false statement. Disassociating H & W from Solace and Nationwide may have prevented creditors from seeking to satisfy H & W debts from the assets of Solace and Nationwide, and therefore [D]efendant intended to defraud creditors by making the false statement.

Plea Agreement at ¶ 28. In exchange for Defendant's guilty plea, the government agreed to move to dismiss Counts 1 through 10 at the time of sentencing.

### C. Sentencing

On November 15, 2007, the United States Probation Office ("USPO") filed the Amended and Final Copy of Defendant's Presentence Investigation Report ("PSIR").

On January 4, 2008, Defendant filed a Motion for Downward Departure ("Motion") (docket no. 62). Defendant requested that the court depart downward from the advisory Sentencing Guidelines range, pursuant to USSG § 5K2.0. Construed liberally, the Motion also requested a downward variance from the advisory Sentencing Guidelines range based on consideration of all the 18 U.S.C. § 3553(a) factors.

On January 14, 2008, the court notified Defendant that it was considering whether to depart or vary upward from the advisory Sentencing Guidelines range. On March 24, 2008, the parties filed a Stipulation (docket no. 74). On April 14, 2008, the government and Defendant filed their respective sentencing memoranda. On April 21, 2008, the parties filed responsive briefs.

On February 25–27, 2008, March 24, 2008, and July 7, 2008, the court held a contested sentencing hearing ("Hearing"). Assistant United States Attorney C.J. Williams represented the government. Attorney Richard O. McConville represented Defendant, who was personally present throughout the Hearing.

At the conclusion of the Hearing, the court sentenced Defendant to 120 months of imprisonment. The instant Sentencing Memorandum is designed to explain how the court resolved the primary legal issues in the case. It is not comprehensive and

should be read in conjunction with the record of the Hearing.

### III. SENTENCING FRAMEWORK

■ The Eighth Circuit Court of Appeals states that a "district court should begin [a sentencing proceeding] with a correct calculation of the advisory Sentencing Guidelines range." *United States v. Braggs*, 511 F.3d 808, 812 (8th Cir.2008). The advisory Sentencing Guidelines range "is arrived at after determining the appropriate Guidelines range and evaluating whether any traditional Guidelines departures are warranted." *United States v. Washington*, 515 F.3d 861, 865 (8th Cir. 2008).

■ "[A]fter giving both parties a chance to argue for the sentence they deem appropriate, the court should consider all of the factors listed in 18 U.S.C. § 3553(a) to determine whether they support the sentence requested by either party." *Braggs*, 511 F.3d at 812. "The district court may not assume that the Guidelines range is reasonable, but instead 'must make an individualized assessment based on the facts presented.'" *Id.* (quoting *Gall v. United States*, —— U.S. ——, ——, 128 S.Ct. 586, 597, 169 L.Ed.2d 445 (2007)). "If the court determines that a sentence outside of the Guidelines is called for, it 'must consider the extent of the deviation and ensure that the justification is sufficiently compelling to support the degree of the variance.'" *Id.* "The sentence chosen should

be adequately explained so as 'to allow for meaningful appellate review and to promote the perception of fair sentencing.'" *Id.*

■ In sentencing Defendant, the court made findings of fact by a preponderance of the evidence. "[J]udicial fact-finding using a preponderance of the evidence standard is permitted provided that the [Sentencing Guidelines] are applied in an advisory manner." *United States v. Bah*, 439 F.3d 423, 426 n. 1 (8th Cir.2006). Generally, the government bore the burden of proof. *Compare United States v. Flores*, 362 F.3d 1030, 1037 (8th Cir.2004) (stating that the government bears the burden to prove sentencing enhancements), *with United States v. Lussier*, 423 F.3d 838, 843 (8th Cir.2005) (holding that defendant had the burden of proving a reduction in his offense level under the advisory Sentencing Guidelines). The court considered a wide variety of evidence, including the undisputed portions of the PSIR, the stipulated facts in the Plea Agreement and the testimony and other evidence that the parties introduced at the Hearing. When relevant and "accompanied by sufficient indicia of reliability to support the conclusion that it [was] probably accurate," the court credited hearsay. *United States v. Sharpfish*, 408 F.3d 507, 511 (8th Cir. 2005).[2]

The court did not "put on blinders" and only consider the evidence directly underlying Defendant's two offenses of conviction. In calculating Defendant's advisory

---

**2.** The court overruled Defendant's Fifth and Sixth Amendment arguments that the court could not impose punishment based upon judge-found facts or hearsay, *see* Sentencing Memorandum (docket no. 83), at 36–38, because the Eighth Circuit Court of Appeals has repeatedly rejected them. *See, e. g., United States v. Bradford*, 499 F.3d 910, 919–20 & 922 (8th Cir.2007) (discussing *United States v. Booker*, 543 U.S. 220, 125 S.Ct. 738, 160

L.Ed.2d 621 (2005), *Blakely v. Washington*, 542 U.S. 296, 124 S.Ct. 2531, 159 L.Ed.2d 403 (2004) and *Apprendi v. New Jersey*, 530 U.S. 466, 120 S.Ct. 2348, 147 L.Ed.2d 435 (2000)); *United States v. Brown*, 430 F.3d 942, 944 (8th Cir.2005) (discussing *Crawford v. Washington*, 541 U.S. 36, 124 S.Ct. 1354, 158 L.Ed.2d 177 (2004) and *United States v. Pirani*, 406 F.3d 543 (8th Cir.2005) (en banc)).

Sentencing Guidelines range, for example, the court applied the familiar doctrine of relevant conduct. *See* USSG § 1B1.3 (2001). The Eighth Circuit Court of Appeals has repeatedly held that a district court may consider uncharged, dismissed and even acquitted conduct at sentencing. *See, e.g., United States v. Whiting,* 522 F.3d 845, 850 (8th Cir.2008) ("The sentencing court is not prohibited from considering uncharged or acquitted conduct."); *United States v. Bradford,* 499 F.3d 910, 922 (8th Cir.2007), *cert. denied,* —— U.S. ——, 128 S.Ct. 1446, 170 L.Ed.2d 278 (2008) (upholding upward departure based on relevant conduct that formed the basis for a dismissed indictment); *see also United States v. Jimenez,* 513 F.3d 62, 88 (3d Cir.2008) ("The counts of conviction determined [the defendant's] sentencing exposure, and the district court was free to consider relevant conduct, including conduct resulting in acquittal, that was proved by a preponderance of the evidence in determining [the defendant's] sentence within the original statutory sentencing range.").

## IV. FINDINGS OF FACT

The evidentiary record in this sentencing is literally voluminous. It is unnecessary to detail every possible subsidiary factual finding or explain how the court resolved each and every inconsistency. Rather, it suffices to (1) outline Defendant's fraudulent scheme and (2) discuss with particularity the testimony of Defendant's three key witnesses: Lois Lex, Linda Schueller and Larry Eide. *See Rita v. United States,* —— U.S. ——, ——, 127 S.Ct. 2456, 2468, 168 L.Ed.2d 203 (2007) ("The appropriateness of brevity or length, conciseness or detail, when to write, what to say, depends upon the circumstances.... The law leaves much, in this respect, to the judge's own professional

judgment."). The court makes further factual findings in Parts VI–VIII, *infra.*

### A. Outline of Defendant's Fraudulent Scheme

#### 1. H & W

H & W was a private, family-owned, union trucking company. H & W was headquartered in Dubuque, Iowa. It operated terminals throughout the Midwest.

At the end of 2000, H & W was viable but struggling. Although H & W had significant assets, including trucks, trailers, equipment and office furniture, it had a large unfunded pension liability. It was also losing money each year: expenses exceeded revenues.

#### 2. Defendant's fraudulent scheme

Defendant learned of H & W's problems and devised a complex scheme to assume control of H & W. He wanted to run H & W into the ground for his own personal benefit and at the expense of H & W's creditors.

Defendant falsely represented himself to H & W's owners as a successful and experienced corporate executive who was ready, willing and able to reinvigorate H & W and return it to profitability. In truth, Defendant intended to liquidate and funnel H & W's assets to four other corporations that he controlled or otherwise had a close relationship with: Solace, Nationwide, EHI and STRAC ("the insider corporations"). Defendant then planned to plunge H & W into bankruptcy-leaving its creditors and employees with nothing.

In January of 2001, Defendant assumed control of H & W. From June of 2001 through June of 2002, Defendant funneled approximately $1.8 million worth of assets from H & W to the insider corporations.

On June 12, 2002, H & W filed a Voluntary Petition under Chapter 11 of the United States Bankruptcy Code in the

Bankruptcy Court. Defendant signed the Voluntary Petition as CEO and owner of H & W. H & W listed approximately $4.4 million in assets and $5.6 million in debts.

In furtherance of his intent to defraud H & W's creditors out of approximately $1.8 million, Defendant repeatedly perjured himself throughout *H & W Motor Express.* On June 27, 2002, Defendant submitted the Schedules. Defendant knowingly and fraudulently made a number of false statements in the Schedules under penalty of perjury in furtherance of his scheme to defraud H & W's creditors. Defendant lied and represented to the Bankruptcy Court that (1) there were no "payments made within one year immediately preceding the commencement of the bankruptcy case to or for the benefit of creditors who are or were insiders"; (2) there were "no inventories taken of the property of H & W"; (3) there were no "distributions credited or given to an insider, including compensation in any form," in the one year immediately preceding the commencement of *H & W Motor Express;* (4) H & W had no office equipment, furnishings or supplies; (5) H & W had no machinery, fixtures, equipment or supplies used in its business; and (6) H & W had no inventory.

On July 18 and August 15, 2002, the United States Trustee convened the § 341 Meeting. Defendant testified at the § 341 Meeting under oath and faced questions from a raucous group of creditors. Defendant lied and represented to those assembled at the § 341 Meeting that (1) H & W "didn't own any equipment"; (2) Defendant "never took any wages or salaries or anything else from the day [he] walked in the door there [at H & W]"; (3) Solace had

"no relation at all" with H & W; (4) "I don't know [what STRAC is]"; (5) "I have no ownership or affiliation with Nationwide"; and (6) he was "not aware" of any common officers between Solace, Nationwide and H & W.

### 3. Baron's role

Attorney A. Frank Baron represented H & W in *H & W Motor Express.* Baron also controlled a number of trust accounts for H & W and Midland, a company Galley Smith had hired Baron to represent in December of 2001. The government presented evidence to show that Baron (1) used the trust accounts to help Defendant and his associates channel funds from H & W into the insider corporations; (2) knew Defendant was lying in the Bankruptcy Court and helped to keep Defendant's lies hidden; and (3) lied to the Bankruptcy Court.

First, Baron helped Defendant and his associates channel funds from H & W into the insider corporations. In May of 2002, Baron accepted a $50,000.00 wire transfer from Solace as a retainer for filing H & W's bankruptcy. Baron placed the $50,000.00 in H & W's trust account.[3] On June 12, 2002, the date H & W's bankruptcy was filed, Baron transferred $14,229.47 from H & W's trust account to a trust account for Midland. Baron broke up the transfer of $14,229.47 into three smaller payments of $9,735.66, $1,993.81 and $2,500.00 without adequate explanation. Further, without adequate explanation, the third transaction did not post in Midland's trust account until two days after it left H & W's trust account.

---

**3.** Solace retained control over the $50,000.00. For example, on May 23, 2002, Baron wired $45,000 of the $50,000 to one of H & W's bank accounts in Dubuque. Immediately upon receipt, H & W then wire transferred $20,000 to Solace. On May 29, 2002, Baron accepted a wire transfer in the amount of $45,000 from a H & W bank account back into H & W's trust account.

Second, Baron knew Defendant was lying in the Bankruptcy Court and helped to keep Defendant's lies hidden. For example, H & W's bankruptcy filings required H & W to disclose any payments by H & W for the filing of the bankruptcy. The filings state that H & W paid Baron's law firm $50,000 in May of 2002. Baron knew this was a false statement. Not only did Baron know that Solace had paid the $50,000 to his law firm, Baron also transferred $14,229.27 of the $50,000 in H & W funds to Midland.[4]

Third, Baron lied to the Bankruptcy Court. For example, Baron told H & W's creditors and the United States Trustee at the § 341 Meeting that "I have nothing to do with STRAC[ ]." Gov't Ex. 6, at 58. On December 3, 2001, however, Baron had accepted a $1,800 wire transfer from STRAC into Midland's trust account. Further, Baron knew that STRAC and Solace were closely related to H & W. Baron implausibly testified at the Hearing that he did not have a responsibility to ensure that they were disclosed as insiders on H & W's bankruptcy petition because he was permitted to rely on information Defendant and his associates had provided. However, Brad Hartke brought a draft of H & W's bankruptcy filings to Baron on the date Baron filed them with various questions about the lies therein. Baron told Hartke to leave the room, talked with Defendant and then simply signed and filed the schedules without making any changes thereto.[5]

### B. Ongoing Efforts: Lex, Schueller & Eide

In making the foregoing factual findings, the court gave little to no weight to the testimony of Defendant's three key witnesses: Lois Lex, Linda Schueller and Larry Eide. The court found that Lex, Schueller and Eide were not credible. In what follows, the court discusses the testimony of these three witnesses at length and makes further factual findings. These further factual findings bear on a number of legal issues in this case, most notably Defendant's request in the Motion for a downward departure or variance. Defendant argues he is entitled to a lesser sentence on account of his ongoing efforts with Lex, Schueller and Eide. *See infra* Part VII.B.

### 1. Lex

Lois Lex worked as a secretary at H & W for forty-six years. Today, Lex works full-time on Defendant's litigation. She employs Schueller to help her.

At the Hearing, Lex testified that she has spent hundreds of thousands of dollars on Defendant's various legal cases, including the instant criminal matter. In addition to paying Defendant's attorneys' fees for the last three years, Lex pays Defendant's hotel expenses and credit card bills. She pays his rent and his cable television. She gives Defendant's wife and children $1,000 a week in spending money.

Lex characterizes her financial support for Defendant and his family as a "loan." Lex testified that Defendant promised to pay her back all the money she has "loaned" him. Further, Lex testified that Defendant has agreed to compensate her for all the work that she and Schueller have expended over the last three years.

---

4. In a similar vein, Baron failed to ensure that this $14,229.27 was listed as a preferential payment in H & W's bankruptcy filings. Baron knew Galley Smith was a common officer with STRAC, Midland, Solace and H & W.

5. When the creditors and the United States Trustee discovered false statements and other deficiencies in H & W's court filings at the § 341 Meeting, Baron promised to amend them. The record does not disclose that Baron ever kept his promises.

In contrast to her seemingly pinpoint knowledge of H & W's finances seven years ago, Lex was exceedingly vague and evasive when it came to describing her own finances or the nature of her "loan" to Defendant. After much prodding, Lex testified that Defendant "owes" her around $700,000. She further testified that Defendant has not made any payments on the "loan" since 2003.

Lex insisted that all of the money she spent on Defendant came from her own savings. She denied under oath that Defendant had funneled money to her from H & W or other insider corporations at some prior point in time. When asked why she was so generous to Defendant, Lex testified she "knew he wasn't guilty" and her parents raised her to "help somebody in need." Sentencing Hearing Transcript ("S.H.T.") at 987, 988. She later stated caustically: "I know it would have been easier if I had taken my money and—and endowed a church or something, where I would have got my name on a plaque. I understand that that would have been a lot easier." *Id.* at 1037.

The court found Lex's testimony to be inherently incredible. Lex is one of the more untruthful and deceitful witnesses that the court has had the opportunity to observe in recent years. Lex gave careful, calculated testimony: she was very specific when she wanted but "played dumb" when it suited her. The court was not fooled.

On cross-examination, Lex admitted she has never made more than $30,000 a year and has not received any significant sums of money from legitimate sources over the course of her lifetime, other than a small inheritance from her parents decades ago and some investment income, primarily from municipal bonds. Although Lex lives in a house and does not owe any money on it, she borrowed $60,000 from her sister to buy the house fourteen years ago and has not yet paid her sister anything back. One of Lex's former coworkers, Robert Moore, testified that Lex's financial means were so limited around the time of the filing of H & W's bankruptcy that she routinely "ate a half a bologna sandwich for lunch, ... was wearing very dated clothing [and] drove a very modest vehicle...." *Id.* at 402–03. Moore felt so sorry for Lex's plight that he took it upon himself to give her hundreds of dollars each week, even though the Bankruptcy Court had fixed her salary.[6]

Lex did not have a credible explanation for her sudden wealth or her ability to fund Defendant's lifestyle and litigation to the tune of $700,000. As indicated, Lex was very evasive and unspecific when she testified as to the "owed" amounts and the status of her finances. Some of her answers on cross-examination completely strained all credulity. For example, Lex repeatedly stated that she did not know why she wrote a large number of checks, totaling hundreds of thousands of dollars, to attorneys who either represented De-

---

**6.** Moore testified that, after the filing of *H & W Motor Express* in June of 2002, Defendant hired him to work as an accountant for $3,000 per week with Eide's approval. Moore testified a bankruptcy judge had set Lex's salary at a fixed sum. *See also Eide v. Lex (In re H & W Motor Express)*, No. 04–9099, 2005 WL 1490009, *2 (Bankr.N.D.Iowa Jun.22, 2005) ("The Court entered an order on July 15, 2002 approving payment to Ms. Lex for contract services at $25 per hour for up to 40 hours per week."). Moore gave Lex the "gifts" to circumvent the bankruptcy judge's order. Lex quoted Moore as spontaneously stating: "I just feel sorry for you, because you're not getting paid as much as you should." Neither Moore nor Lex disclosed their arrangement to Eide or the bankruptcy judge. Defendant also asked for and received a "loan" of $1,500 from Moore for a "vacation."

fendant or were otherwise affiliated with him.

The court does not believe that Lex was independently wealthy and, out of the goodness of her heart, suddenly decided to loan Defendant large sums of money on vague terms. Rather, the court believes there is a much simpler explanation for Lex's sudden wealth and generosity. It is much more probable that Lex and Defendant have conspired to secret away the missing H & W funds into Lex's possession and that Lex has been funneling that money back to Defendant and his family. That is, the court believes Lex perjured herself when she testified: "He has not given me any money" and "It's my money." *Id.* at 990.[7]

Lex's demeanor and sudden wealth and generosity towards Defendant and her feeble explanations are not the only evidence that she and Defendant have conspired to steal H & W's funds from its creditors. On cross-examination, Lex admitted that she now owns a corporation, Women's In-vestment Property Trust ("WIPT"), which owns property with strong links to Defendant and One Stop, a corporation Defendant controlled with his wife. In 2005, while Defendant and One Stop were facing the prospect of a federal criminal indictment and foreclosures, One Stop transferred over $2 million in real and personal property to Lex without a contemporaneous exchange of fair value.[8] Although Lex characterizes the transaction between One Stop and WIPT as a means to provide security for her hefty "loans" to Defendant, the court does not believe Lex. Only one attorney brokered the "deal"—Tom Pocola, Defendant's personal attorney and the attorney who represented Defendant at the § 341 Meeting. The court believes it is much more probable that Defendant and Lex entered into an illicit agreement to shelter and safeguard Defendant's assets until his considerable legal troubles end.[9] The property WIPT now controls generates a significant amount of income and can be used to fund Defendant's litigation and support his family.[10]

---

**7.** Lex repeatedly perjured herself at the Hearing in an attempt to help Defendant. She lied when she testified that Defendant routinely delegated tasks to others; Lex was attempting to shift blame from Defendant to Galley Smith and others. Lex also lied when she testified that she does not believe Defendant knew about STRAC. Lex's signature is on a document, dated May 28, 2001 and signed by Defendant, that authorized H & W to pay $100,000 to Midland for a feasability study to purchase STRAC. *Compare* Gov't Ex. 15, *with* S.H.T. at 1045. Further, Lex lied when she testified that Defendant did not know H & W was working with Nationwide. Lex's signature is on a document that indicates Defendant was "CEO" of Nationwide.

**8.** The assets included real property, truck terminals, houses and vacant lots. While the connection between One Stop and Solace, Nationwide, EHI and STRAC is not entirely clear, there is presently an adversary action ("Adversary Action") pending in *H & W Motor Express*, in which the bankruptcy trustee alleges that One Stop received H & W's funds without a contemporaneous exchange of good value. The court also notes that Defendant presented the court with evidence to show that One Stop purchased the assets of Solace. *See* Def. Ex. P.

**9.** It is unclear to what precise extent Lex has remitted funds to Defendant and his wife or to another corporation she controls, DOG Incorporated.

**10.** The government has not yet charged Lex with any crimes. However, it observes:

[D]efendant's conduct with regard to Lois Lex is, at best, disturbing. It appears one of two things has occurred: 1)[D]efendant has used Ms. Lex to set up straw corporations to whom he has "sold" or pledged his personal and other business assets as collateral in an attempt to make himself judgment proof as to claims of creditors and the courts, or; 2)[D]efendant has deluded a wealthy woman into parting with substantial sums to fund his legal battles.

## 2. Schueller

Linda Schueller is a former H & W employee who now works for DOG, Incorporated ("DOG"). Lex bought DOG from Defendant for $1 in the fall of 2002. Through DOG, Lex employs Schueller and contracts for Defendant's "services." At one time DOG purported to sell a product called "Bizpads," a combination business card and scratch pad. Lex now admits that the sole function of DOG is "digging," that is, running Defendant's litigation.

Schueller takes direction from Lex, who pays her bills and tells her to obey Defendant's orders. Schueller has spent the better part of the last three years reconstructing financial records for use in Defendant's legal cases, including the instant criminal matter.

Schueller does not hold an accounting degree and lacks any training in forensic accounting. Her attempts to summarize H & W's finances over the years are wholly unreliable if not farcical. The court did not find her testimony or exhibits to be competent, trustworthy or reliable. In contrast, the court found that Special Agent Jeff McGuire's forensic analysis to be more credible. Special Agent McGuire has a degree in accounting and fourteen years of experience with the Investigation Division of the Internal Revenue Service.

## 3. Eide

Larry Eide is a lawyer from Mason City, Iowa. Since September 17, 2002, he has worked as the bankruptcy trustee in *H & W Motor Express*. Eide testified that his role as the bankruptcy trustee is to "look out for the unsecured creditors" by "corrall[ing] all the property, determin[ing] whether or not there's any equity, convert[ing] it to cash, and then pay[ing] creditors." S.H.T. at 765–66. Eide has spent hundreds of hours looking for H & W's assets.

During the last six years, Eide has instituted a number of civil actions against persons or entities that he believed held assets that H & W's creditors should recover.[11] In 2004, Eide brought an adversary action ("Adversary Action") against Defendant and others, including Defendant's wife, Dawn Waldner, and One Stop. Eide alleged that Defendant transferred "in excess of [$] 1.5 million" out of H & W "without a contemporaneous exchange of good value." Gov't Ex. 814. Eide alleged that the defendants in the Adversary Action were still in possession of such funds.

Sentencing Memorandum (docket no. 82), at 40–41.

11. Early on, Eide sued Lex. *See generally Eide v. Lex (In re H & W Motor Express)*, No. 04–9099, 2005 WL 1490009 (Bankr.N.D.Iowa Jun.22, 2005). Eide presented evidence that, on June 19, 2002, H & W wire transferred $5,393.50 to Lex. *Id.* at *2. Eide alleged that this wire transfer was a post-petition transfer recoverable under 11 U.S.C. § 549. *Id.* A hand-written note accompanied the request for the wire transfer. *Id.* The note read: "Post Petition Prepayment for Consulting Fees." *Id.*

Lex testified in the Bankruptcy Court that the wire transfer was a post-petition payment for pre-petition work. *Id.* She testified the

note was "inaccurate" and "she did not know why that notation was added" to the wire transfer. *Id.* Relying on Lex's testimony, the bankruptcy judge found that the wire transfer "compensated [Lex] for services rendered prepetition" and dismissed Eide's adversary proceeding against her. *Id.* at *4.

At the § 341 Meeting, Defendant testified that the very same wire transfer was, in fact, a "deposit" or "escrow account," that is, a post-petition prepayment for consulting fees. *See* Gov't Ex. 4, at 138–39. Robert Moore testified that the wire transfer was a "retainer" or "up-front money" for future services, in the event that H & W were unable to pay for her "services" while the bankruptcy judge was overseeing the estate. *Id.* at 140–41.

At the Hearing, Eide retreated from his allegations in the Adversary Action. He testified that he now believes that "a bunch of that money did come back" into H & W. S.H.T. at 777. Eide testified that he bases his newfound conclusion upon bank records, documents and other information that Defendant, Lex and Schueller provided to him. Eide also testified that he believes "there [are] a lot of people picking on" Defendant. *Id.* On January 3, 2008, Eide filed a proposed settlement in the Bankruptcy Court. *See* Gov't Ex. 814, *passim* ("Proposal for Approval of Compromise or Settlement of Controversy; and Application to Employ Special Counsel") ("Proposal").

Under the terms of the Proposal, Lex would pay the bankruptcy estate $5,000.00. In return, the bankruptcy estate would (1) hire one of Defendant's law firms, the Dutton Firm, to recover all claims of the bankruptcy estate and (2) give 80 % of all recovered sums to Lex and the Dutton Firm. The compromise is not limited to settlement of claims against the Waldners and One Stop; it would settle "numerous causes of actions and claims" that could be worth "millions of dollars." [12]

Eide's support for the Proposal betrays a fundamental lack of judgment. Eide has proposed a settlement that is extremely favorable to Lex and unfavorable to H & W's creditors. Further, Lex is not a forensic accountant or even a disinterested party; she is an insider and a former employee of H & W who retains strong ties to Defendant-a man who has admitted

to two counts of bankruptcy fraud in this very bankruptcy proceeding. There is no evidence that Eide solicited proposals from other persons or entities that might afford the creditors a better return or consideration. Eide's decision to include Lois Lex in the Proposal is nothing more than a thinly veiled attempt to compensate Lex for her reconstruction of the financial records in this and Defendant's other cases. Indeed, he testified at the Hearing that he has conducted little to no investigation of Lex and her corporations; rather, he has simply proceeded on an assumption that Lex's newfound wealth is wholly unrelated to H & W's poverty. Eide has wholly foresaken his charge to look after the best interests of the creditors. Instead of blindly accepting the representations of Lex and Defendant, Eide should target them as the ultimate recipients of H & W's assets.

As a consequence of his fundamental lack of judgment, the court does not credit Eide's testimony, including his vague assertion that "a bunch of that money did come back" into H & W. S.H.T. at 777. The court also does not credit Eide's testimony that Defendant "delegated a lot of duties to others [and] relied upon them." *Id.* at 789. This testimony, which Lex and Schueller reiterated, is patently false; it is abundantly clear that Defendant largely micromanaged H & W's affairs. Defendant, not Galley Smith or anyone else, orchestrated this scheme and controlled H & W. Eide's bald observation that others

---

**12.** At the Hearing, Eide, Lex and Schueller made a number of unsubstantiated allegations against various Dubuque banks, insurance companies and the former owners of H & W. For example, Lex testified that Community Bank is "liable" for "movement of money out of wrong accounts." S.H.T. at 1057. Schueller testified that Community Bank, American Trust and Premiere Bank "allowed a lot of

discrepancies, a lot of things to happen, that the banks should not have allowed." *Id.* at 1104. Defendant introduced an exhibit at the hearing that alleges that American Trust and Savings Bank is responsible for over $34 million in "NEGLIGENCE—FEDERAL BANKING ISSUES." Def. Ex. 7517 (emphasis in original).

"took advantage" of Defendant is beyond the pale. *Id.* at 790.

### V. PRIMARY LEGAL ISSUES

The primary legal issues in this sentencing fell into three broad categories. The first category of issues concerned Defendant's pre-departure advisory Sentencing Guidelines range. The second category of issues concerned Defendant's final advisory Sentencing Guidelines range. The third category of issues were not concerned in the first instance with the advisory Sentencing Guidelines.

The court decided six legal issues when calculating Defendant's pre-departure advisory Sentencing Guidelines range. First, the court decided whether Defendant should receive a sixteen-level increase, pursuant to USSG § 2B1.1(b)(1)(I), because he is responsible for more than $1,000,000 in loss. Second, the court decided whether Defendant should receive a four-level increase, pursuant to USSG § 2B1.1(b)(2)(B), because he is responsible for at least fifty victims. Third, the court decided whether Defendant should receive a two-level increase, pursuant to USSG § 2B1.1(b)(8)(C), because he used "sophisticated means." Fourth, the court decided whether Defendant should receive a two-level increase, pursuant to USSG § 3B1.3, because he abused a position of private trust. Fifth, the court decided whether Defendant should receive a two-level increase, pursuant to USSG § 3C1.1, because Defendant obstructed justice. Sixth, the court decided whether Defendant should receive a two- or three-level reduction, pursuant to USSG § 3E1.1, because he accepted responsibility.

The court decided five legal issues when calculating Defendant's final advisory sentencing guidelines range. First, the court decided whether it should depart downward, pursuant to USSG § 5K2.0 (Grounds for Departure). Second, the court decided whether to depart upward, pursuant to USSG § 5K2.3 (Extreme Psychological Injury). Third, the court decided whether to depart upward, pursuant to § 5K2.5 (Property Damage or Loss); Fourth, the court decided whether to depart upward, pursuant to § 5K2.9 (Criminal Purpose). Fifth, the court decided whether it should depart upward, pursuant to § 5K2.21 (Dismissed and Uncharged Conduct).

The court decided two non-advisory Sentencing Guidelines range issues. First, the court considered all of the factors at 18 U.S.C. § 3553(a) and determined Defendant's sentence. Second, the court decided whether Defendant must pay restitution.

The court considers these three categories of issues, in turn.

### VI. PRE–DEPARTURE ADVISORY SENTENCING GUIDELINES RANGE

The parties agreed that the applicable sentencing guideline for Defendant's violations of 18 U.S.C. § 152(3) is § 2B1.1. *See* USSG App. A (Statutory Index). The parties also agreed that Defendant's base offense level is **6.** USSG § 2B1.1(a). Finally, the parties agreed that Defendant is subject to a **two-level** increase, pursuant to USSG § 2B1.1(b)(7)(B), because the offense involved misrepresentation or other fraudulent action in a bankruptcy proceeding. Thus, it was stipulated that Defendant's adjusted offense level is at least **8.** The parties disagreed as to whether six other adjustments under Chapters 2 or 3 of the advisory Sentencing Guidelines applied. The court considers these six adjustments, in turn.

#### A. Amount of Loss—USSG § 2B1.1(b)(1)(I)

The first primary legal issue the court decided in this sentencing was whether

Defendant should receive a sixteen-level increase, pursuant to USSG § 2B1.1(b)(1)(I), because he is responsible more than $1,000,000 in loss.

### 1. Law

In pertinent part, § 2B1.1(b)(1) states:

§ **2B1.1.** *Larceny, Embezzlement, and Other Forms of Theft; Offenses Involving Stolen Property; Property Damage or Destruction; Fraud and Deceit; Forgery; Offenses Involving Altered or Counterfeit Instruments Other than Counterfeit Bearer Obligations of the United States*

\* \* \*

(b) Specific Offense Characteristics (1) If the loss exceeded $5,000, increase the offense level as follows:

| Loss (Apply the Greatest) | Increase in Level |
| --- | --- |
| (A) $5,000 or less | no increase |
| (B) More than $5,000 | add 2 |
| (C) More than $10,000 | add 4 |
| (D) More than $30,000 | add 6 |
| (E) More than $70,000 | add 8 |
| (F) More than $120,000 | add 10 |
| (G) More than $200,000 | add 12 |
| (H) More than $400,000 | add 14 |
| (I) More than $1,000,000 | add 16 |
| (J) More than $2,500,000 | add 18 |

\* \* \*

USSG § 2B1.1(b)(1) (emphasis in original).

Generally, "loss is the greater of actual loss or intended loss." USSG § 2B1.1 cmt. (n. 2); *United States v. Porter,* 417 F.3d 914, 917 (8th Cir.2005). "Actual loss" is defined as "the reasonably forseeable pecuniary harm that resulted from the offense." USSG § 2B1.1, cmt. (n. 2). "Intended loss" is defined as "the pecuniary

harm that was intended to result from the offense." *Id.*

■ The government bears the burden to prove "loss" by a preponderance of the evidence. *United States v. Staples,* 410 F.3d 484, 490 (8th Cir.2005). The amount of the loss, however, need not be determined with precision. *See, e.g., United States v. French,* 46 F.3d 710, 715 (8th Cir.1995). Indeed, there is no precise rubric for determining the amount of loss under § 2B1.1. *See, e.g., United States v. Holthaus,* 486 F.3d 451, 455 (8th Cir.2007), *cert. denied,* — U.S. ——, 128 S.Ct. 343, 169 L.Ed.2d 241 (2007) ("There is no blanket rule defining intended loss as the lesser of the value of assets concealed or the value of the debtor's liabilities. Indeed, some factual scenarios may require an intended loss calculation based on the *greater* of the value of the assets concealed or debt sought to be discharged." (Emphasis added.)) "The court need only make a reasonable estimate of the loss." USSG § 2B1.1, cmt. (n. 2). Further, intended loss "includes intended pecuniary harm that would have been impossible or unlikely to occur . . . ." *Id.*

### 2. Arguments [13]

The government argued that Defendant intended that the creditors of H & W lose more than $1,000,000, and thus the court should impose a sixteen-level increase to Defendant's base offense level. The government argues that the intended loss is the amount that Defendant and his subordinates "bled out" of H & W and into the insider corporations in the year preceding the filing of *H & W Motor Express* on June 12, 2002. That is, the government alleges that Solace, Nationwide, STRAC

---

**13.** The parties did not argue about "actual loss" but instead focused solely on Defendant's "intended loss." Accordingly, the court confined its analysis to the amount of

loss Defendant intended. That is, the court gave Defendant the benefit of the doubt and assumed that the amount of actual loss in this case is less than the amount of intended loss.

and EHI were "insiders," *viz.*, corporations with sufficiently close relationships to Defendant and H & W that the bankruptcy trustee and the creditors of H & W were entitled to attempt to recoup any payments thereto. The government points out that, in his Plea Agreement, Defendant admitted he lied about the connections between H & W and Nationwide and Solace, in order to prevent the bankruptcy trustee and creditors from recouping such payments. Specifically, Defendant knew that "[d]isassociating H & W from Solace and Nationwide may have prevented creditors from seeking to satisfy H & W debts from the assets of Solace and Nationwide, and therefore [D]efendant intended to defraud creditors by making the false statement." Plea Agreement at ¶ 28. The government contends that the transfers to EHI and STRAC are relevant conduct, because they are part of the same course of conduct or common scheme or plan as the offense of conviction. The government summarizes:

> Defendant was asked to [disclose payments to Nationwide and Solace] because under bankruptcy law the trustee can rescind such payments made to insiders, regardless of whether they were legitimate payments. Defendant made these fraudulent statements with the intent to defraud his creditors by preventing the trustee and creditors from seeking to satisfy H & W debts from the assets of Solace and Nationwide. By lying about the connections between H & W, the defendant, and the other companies, it prevented the trustees and the creditors from being able to take any action to rescind the payments. Before the true facts were known, Defendant sold Solace and Nationwide for $1.1 million.

* * *

[T]he legitimacy of such payments is irrelevant. Transactions with insiders may be rescindable, even if for legitimate purposes. The perjury and fraud committed by defendant prevented creditors from investigating whether the transactions were legitimate and, even if there were, whether they could be rescinded as preferential payments. Because creditors may have been able to recover the funds transferred to the insider companies if not for defendant's false statements, the loss of the ability to recover those funds is a harm that directly resulted from [the] offense of which defendant was convicted and should be considered as relevant conduct in calculating the specific offense characteristic.

* * *

The intended loss here, of course, was the amount of funds bled out of H & W by defendant and those working for him into his other corporations. He lied about his connection to these insider companies, and the connection between them, because he wanted to prevent the trustee and the creditors from attempting to latch onto the assets of defendant's other companies to satisfy the debts of H & W. Whether the trustee or creditors would have ultimately been successful in rescinding these payments or whether they could have ever recovered any assets from these other corporations, does not matter. Defendant intended to prevent them from even trying by lying and obfuscating the relationships between the companies. It is based on the loss defendant intended to cause that this Court should determine the appropriate loss amount.

Sentencing Memorandum (docket no. 82), at 8–9, 12 (citations omitted).

The government has provided the court with varying estimates of the amount of money Defendant transferred from H & W to the insider corporations in the year preceding the filing of *H & W Motor Express* on June 12, 2002. In its brief, the government states that H & W transferred as much as $1,927,717.01 to the insider corporations during the relevant time-frame. Sentencing Memorandum (docket no. 82), at 13 (citing Gov't Exs. 100, 120, 124, 135 and 152). Accordingly, the government concludes that a sixteen-level increase is appropriate, because Defendant intended that his creditors lose more than $1 million.

Defendant argues that he did not intend any loss to his creditors. As a threshold matter, Defendant argues that the court should not consider any payments to STRAC or EHI, because Defendant did not plead guilty to any counts involving those corporations. With respect to the transactions to Solace and Nationwide, Defendant attempts to shift blame to Galley Smith, whom Defendant alleges transferred funds back and forth between H & W and Solace even though he was not authorized to do so. Defendant contends he did not take part in or even know of many of the transactions between H & W and the insider corporations and thus did not intend any loss from such transactions. Further, Defendant states that he personally guaranteed the debts of H & W, Solace and the prior shareholders of H & W, the Haas and Wissel families. Defendant points out that, after several years of litigation, Eide believes that others have taken advantage of Defendant and Eide has decided to work with Defendant to find H

& W's missing assets. Defendant affirmatively states that the lies that form the basis for his convictions on Counts 11 and 12 "were intended to allow [H & W] to continue operating under chapter 11 in hopes of bringing the company out of its' [sic] money problems and trying to avoid a chapter 7 which would result in a greater loss and possible discharge or loss to creditors." Sentencing Memorandum (docket no. 79), at 29.

### 3. Analysis

◼ As the court's factual findings in Part IV *supra* make clear, the court finds that Defendant intended a loss of approximately $1.8 million to H & W's creditors. Put simply, Defendant devised a complex scheme to liquidate and transfer H & W's assets to a number of other corporations that he and his cronies controlled. Once Defendant bled H & W dry, he filed bankruptcy for H & W. In *H & W Motor Express*, Defendant repeatedly lied about his relationships with the other corporations and individuals. Defendant's intent was plain: to enrich himself at the expense of H & W's creditors.

The $1.8 million figure is the court's best estimate of intended loss. The estimate is based upon Special Agent Jeff McGuire's testimony about the amounts of money Defendant bled out of H & W in the year preceding the filing of the bankruptcy. The court credits Special Agent McGuire's testimony that H & W made more than $1.8 million in payments to the insider corporations during such time. *See* Gov't Exs. 100, 120, 124, 135, 152 and 902.[14]

---

**14.** Exhibits 100 and 120 show that H & W transferred $105,000 to EHI; Exhibit 124 shows that H & W transferred $100,000 to STRAC; Exhibit 135 shows that H & W transferred $459,744.56 to Nationwide; and Exhibit 152 shows that H & W transferred

$1,205,639.28 to Solace. The total of these four exhibits is $1,870,383.84. The court is unsure why the government argues in its brief that the sum total of these figures $1,927,717.01. It is also unclear why the sum of the figures on Exhibit 902 is

■ The court's intended loss calculation includes amounts that Defendant funneled to EHI and STRAC, even though Defendant only pled guilty to lying about Nationwide and Solace. Defendant's actions with respect to all four corporations were part of a single course of conduct or common scheme or plan, and thus he is liable for his actions under the familiar doctrine of relevant conduct. USSG § 1B1.3. Defendant used EHI and STRAC to defraud his creditors in the same manner that he admitted in his Plea Agreement that he used Nationwide and Solace.

It does not matter that Defendant may have successfully hidden some of H & W's assets so that neither his creditors nor the trustee can find them. *See, e.g., Holthaus,* 486 F.3d at 455 (holding that intended loss included amounts that the government and the bankruptcy trustee could not find after a diligent search). Likewise, it does not matter that Defendant may have transferred such sums in a manner in which H & W's creditors would not be able to recover them all as payments to insiders. *See* USSG § 2B1.1, cmt. (n. 3(A)(ii)) (stating that intended loss includes pecuniary harm that would be impossible or unlikely to occur). Further, it does not matter that Defendant used or directed others to make many of the transfers. The vagaries of federal bankruptcy law are not at issue here;[15] the ultimate enquiry is Defendant's intent. The court finds that, in the present case, the large amounts of money that Defendant transferred from H & W to

the insider corporations, coupled with his admissions in the Plea Agreement that he made some of the transfers to defraud H & W's creditors, is the best evidence of Defendant's intent as to loss. *Cf. Holthaus,* 486 F.3d at 455. There is simply no credible evidence in the record that Defendant intended to defraud his creditors of anything less. *Cf. id.* As indicated in Part IV.B *supra,* the court did not find the testimony of Lex, Eide or Schueller to be credible or the documentary evidence Defendant introduced through these witnesses to be competent. Even if the court were to assume that Defendant made guarantees to repay funds to H & W, the court does not believe that he intended to follow through on his promises.

Defendant's bald representation to the court in his Sentencing Memorandum that his lies "were intended to allow [H & W] to continue operating under chapter 11 in hopes of bringing the company out of its' [sic] money problems and trying to avoid a chapter 7 which would result in a greater loss and possible discharge or loss to creditors" is not evidence. In any event, it is wholly self-serving and the court disregarded it. Defendant's statement amounts to a denial of criminal intent as to Counts 11 and 12 and thus contradicts Defendant's admissions in his Plea Agreement that he knew that "[d]isassociating H & W from Solace and Nationwide may have prevented creditors from seeking to satisfy H & W debts from the assets of Solace and

---

$1,851,239.05 *See* Gov't Ex. 902 (totals of payments to Solace, EHI, STRAC and Nationwide). The court found Exhibits 100, 120, 135 and 152 to be the best evidence of Defendant's intended loss, but out of an abundance of caution rounded down its loss estimate to $1.8 million. The court's estimate is doubly conservative, because the court has assumed without deciding that Defendant did not intend any loss when he divested H & W of a

considerable amount of equipment and office furniture.

15. Under bankruptcy law, an insider generally includes any person or entity who has " 'a sufficiently close relationship with the debtor that [its] conduct is made subject to closer scrutiny than those dealing at arms length with the debtor.' " *In re Winstar Comm'cns,* 348 B.R. 234, 279 (Bankr.D.Del.2005) (citations and internal quotation marks omitted).

Nationwide, and therefore defendant intended to defraud creditors by making the false statement." Plea Agreement at ¶ 28. Through his attorney, Defendant is dissembling because he wants to minimize his advisory Sentencing Guidelines range.

### 4. Conclusion

Accordingly, the court held that Defendant should receive a **sixteen-level increase,** pursuant to USSG § 2B1.1(b)(1)(I), because he intended more than $1,000,000 in loss. This brought Defendant's adjusted offense level to **24.**

### B. Number of Victims—
### § 2B1.1(b)(2)(B)

▆▆ Second, the court decided whether Defendant should receive a four-level increase, pursuant to USSG § 2B 1. 1(b)(2)(B), because he is responsible for at least fifty victims. The government bore the burden to prove this enhancement applied.

Section 2B 1. 1(b)(2)(B) provides: "If the offense ... involved 50 or more victims, increase by 4 levels." USSG § 2B1.1(b)(2)(B) (emphasis in original). The Commentary to the advisory Sentencing Guidelines defines "[v]ictim" as including "any person who sustained any part of the actual loss determined under subsection (b)(1)." *Id.* cmt. (n. 3(A)(ii)). " 'Person' includes individuals, corporations, companies, associations, firms, partnerships, societies, and joint stock companies." *Id.*

The government provided the court with the following argument in support of a four-level increase in this case:

> [T]he intended loss amount calculated under section 2B1.1(b) consists of the insider transactions that [D]efendant's false statements concealed. This intended loss affected all the creditors who could have benefitted from the

avoidance or rescission of those contracts. There were 289 unsecured creditors of the bankruptcy estate. [PSIR ¶ 90]. Therefore, [D]efendant's offense level is properly increased by 4 levels, pursuant to USSG § 2B1.1(b)(2)(B).

Sentencing Memorandum (docket no. 82), at 14.

The government's argument entirely misses the mark. Section 2B1.1 defines "victim" to include only those persons who have suffered actual loss, not simply anyone whom a defendant intended to suffer loss. As the Eighth Circuit Court of Appeals recently stated, "a victim must be an individual, corporation or company of some type that sustained part of the *actual loss* determined by the district court." *United States v. Icaza,* 492 F.3d 967, 969 (8th Cir.2007) (emphasis added). The government's argument for a four-level increase thus fails, because it is premised upon the number of persons Defendant intended to harm, not the number of persons who sustained an actual loss.

In the alternative, the government states that "whether there was an actual loss or an intended loss, the number of victims remains the same." Sentencing Memorandum (docket no. 82), at 14. The government contends that "more than $1 million left H & W and has been unaccounted for by the trustee" and concludes "[t]hat money could have been available to pay some of the debt owed the creditors." *Id.* The government asserts without explanation that "[t]here were more than 50 creditors affected by [D]efendant's lies...." *Id.* at 15.

The court finds that the actual loss in this case tracks the intended loss. There can be little doubt that Defendant inflicted approximately $1.8 million in actual loss upon the bankruptcy estate, and the court shall order him to make appropriate resti-

tution to the bankruptcy estate. The court also has no doubt that Defendant intended to inflict loss on hundreds of individuals and corporations, that is, all of H & W's 289 creditors. That said, the government has not presented the court with any evidence or legal authority to show that the loss to the bankruptcy estate amounts to an actual loss for each, or any, creditor of the bankruptcy estate. In other words, the court is not convinced by a preponderance of the evidence that all 289 creditors have suffered *actual losses* as a result of Defendant's conduct; for all the court knows, it is equally likely that only one major creditor suffered a loss. It is significant that the bankruptcy estate remains open at the present time.

Accordingly, the court held that an increase in Defendant's adjusted offense level pursuant to USSG § 2B1.1(b)(2)(B) was not appropriate, because the government did not meet its burden of proof. Defendant's adjusted offense level under the advisory Sentencing Guidelines remained at 24.[16]

### C. "Sophisticated Means"— USSG § 2B1.1 (b)(8)(C)

■ Third, the court decided whether Defendant should receive a two-level increase, pursuant to USSG § 2B1.1(b)(8)(C), because he used "sophisticated means." The government bore the burden to prove this enhancement applied.

In its entirety, § 2B1.1(b)(8) provides:

> If (A) the defendant relocated, or participated in relocating, a fraudulent scheme to another jurisdiction to evade law enforcement or regulatory

officials; (B) a substantial part of a fraudulent scheme was committed from outside the United States; or (C) the offense otherwise involved sophisticated means, increase by **2** levels. If the resulting offense level is less than level **12,** increase to level **12.**

USSG § 2B1.1(b)(8) (emphasis in original). In the present case, the government only alleges that Defendant meets prong "(C)", that is, his "offense otherwise involved sophisticated means."

The Commentary defines "sophisticated means" as "especially complex or especially intricate offense conduct pertaining to the execution or concealment of an offense." *Id.* cmt. (n. 6(B)). "Conduct such as hiding assets or transactions, or both, through the use of fictitious entities, corporate shells, or offshore financial accounts also ordinarily indicates sophisticated means." *Id.* The court cannot, however, use conduct that forms the basis for a "sophisticated means" enhancement that it also uses for an obstruction of justice enhancement under USSG § 3C1.1. *Id.* cmt. (n. 6(C)).

Defendant's offense clearly involved "sophisticated means." Defendant's arguments to the contrary are wholly unpersuasive and amount to little more than a frivolous denial of relevant conduct. As the evidence the court received over four days of sentencing attests, this is not your "garden-variety" bankruptcy fraud. *Cf. United States v. Hance,* 501 F.3d 900, 909 (8th Cir.2007) ("The government must show that [the defendant's] mail fraud, when viewed as a whole, was notably more

---

**16.** The court remained free to consider the number of intended victims in deciding where to sentence Defendant within the statutory range of imprisonment. *See* 18 U.S.C. § 3553(a); *cf. United States v. Warthan,* 541 F.Supp.2d 1058, 1067 (N.D.Iowa 2008) (holding that an upward departure was appropriate pursuant to § 5K2.0, because "the advisory Sentencing Guidelines do not capture the large number of intended victims ... apart from the ... victims suffering actual losses ... that triggered the ... increase under § 2B1.1.").

intricate than that of the garden-variety mail fraud scheme."). Defendant established or controlled a number of corporations, the insider corporations, into which he bled H & W's assets. Defendant took elaborate steps to conceal his involvement with these corporations. For example, Defendant incorporated STRAC in others' names. He routinely listed others as officers and owners of these corporations. The corporations were largely if not wholly shell corporations that served no function other than to serve as repositories for assets Defendant stole from H & W's creditors. Like the defendant in *United States v. Halloran,* Defendant's "total scheme was undoubtedly sophisticated" and "did not involve a single fraudulent act, but a complex series of fraudulent transactions." 415 F.3d at 945 (8th Cir.2005).

Accordingly, the court held Defendant should receive a two-level increase, pursuant to USSG § 2B1.1(b)(8)(C), because he used "sophisticated means." This brought Defendant's adjusted offense level under the advisory Sentencing Guidelines to **26**.

### D. Abuse of a Position of Private Trust—USSG § 3B1.3

 Fourth, the court decided whether Defendant should receive a two-level increase, pursuant to USSG § 3B1.3, because he abused a position of private trust. The government bore the burden to prove this enhancement applied.

In full, § 3B1.3 provides:

If the defendant abused a position of public or private trust, or used a special skill, in a manner that significantly facilitated the commission or concealment of the offense, increase by 2 levels. This adjustment may not be employed if an abuse of trust or skill is included in the base offense level or specific offense characteristic. If this adjustment is based upon an abuse of a position of trust, it may be employed in addition to

an adjustment under § 3B1.1 (Aggravating Role); if this adjustment is based solely on the use of a special skill, it may not be employed in addition to an adjustment under § 3B1.1 (Aggravating Role).

USSG § 3B1.3. In relevant part, the Commentary to § 3B1.3 provides the following additional guidance:

*Application Notes:*

1. "Public or private trust" refers to a position of public or private trust characterized by professional or managerial discretion (*i.e.,* substantial discretionary judgment that is ordinarily given considerable deference). Persons holding such positions ordinarily are subject to significantly less supervision than employees whose responsibilities are primarily nondiscretionary in nature. For this adjustment to apply, the position of public or private trust must have contributed in some significant way to facilitating the commission or concealment of the offense (e.g., by making the detection of the offense or the defendant's responsibility for the offense more difficult). This adjustment, for example, applies in the case of an embezzlement of a client's funds by an attorney serving as a guardian, a bank executive's fraudulent loan scheme, or the criminal sexual abuse of a patient by a physician under the guise of an examination. This adjustment does not apply in the case of an embezzlement or theft by an ordinary bank teller or hotel clerk because such positions are not characterized by the above-described factors.

\* \* \*

*Background:* This adjustment applies to persons who abuse their positions of trust or their special skills to facilitate significantly the commission or conceal-

ment of a crime.... Such persons generally are viewed as more culpable. *Id.* cmt. (n. 1) & bckgd.

As applied to the facts of the instant case, the government was required to prove three facts before the court could apply this enhancement. First, Defendant held a position of private trust. Second, Defendant abused such position in a manner that significantly facilitated the commission or concealment of the offense. Third, an abuse of private trust is not included in the base offense level or a specific offense characteristic. USSG § 3B1.3.; *accord United States v. Olson,* 22 F.3d 783, 786 (8th Cir.1994) ("An increase under § 3B1.3 is appropriate ... if a defendant (1) occupied a position of private trust and (2) used the position in a manner that significantly facilitated the commission or concealment of the offense.") (Citation, internal quotation marks and alterations omitted.).

Defendant clearly held a position of private trust. Defendant was CEO of H & W, a position through which he controlled H & W absolutely. For a time, Defendant was sole shareholder of H & W. By virtue of his position, Defendant had substantial discretionary judgment. Defendant micromanaged H & W's affairs; as he told Robert Vance, H & W's President, "You take care of the operation. I'll take care of the money." S.H.T. at 249. Defendant was subject to little to no supervision and, in any event, significantly less supervision than H & W's non-discretionary employees. *See, e.g., United States v. Morris,* 18 F.3d 562, 568 (8th Cir.1994) (holding CEO of bank occupied a position of trust); *United States v. Buck,* 324 F.3d 786, 795 (5th Cir.2003) (holding that president and CEO of a nonprofit corporation occupied a position of private trust).

Defendant abused his position of private trust in a manner that significantly facili-

tated the commission and concealment of his offense. Defendant used his position as CEO to effectuate and conceal the payments to the insider corporations. His position gave him the authority to move funds and order others, including Galley Smith, to move funds without questioning his illicit motives. Defendant's position of private trust clearly made the detection of his offense and his responsibility therefore more difficult. *See, e.g., Morris,* 18 F.3d at 568 (finding that a defendant used her position of private trust in a qualifying manner under analogous circumstances).

Lastly, an abuse of private trust is not included in Defendant's base offense level or a specific offense characteristic. In other words, there is no double counting here, because this is not a case in which "the underlying offense itself consisted of abuse of a position of trust ..." *United States v. Bhagavan,* 116 F.3d 189, 193 (7th Cir. 1997). Rather, this is an offense that was "facilitated by holding a position of trust." *Id.* It is settled that § 3B1.3 may apply to fraud and false statement cases under circumstances such as those present here, in which defendants are sentenced under § 2B1.1 *et seq. See, e.g., Buck,* 324 F.3d at 792–93 (distinguishing *United States v. Broderson,* 67 F.3d 452, 456 (2d Cir.1995)). Without squarely addressing the double-counting issue, the Eighth Circuit Court of Appeals has repeatedly affirmed the use of the § 3B1.3 enhancement in analogous fraud and false statement cases under the same or similar base offense level guidelines. *See, e.g., Morris,* 18 F.3d at 568; *United States v. Baker,* 200 F.3d 558, 564 (8th Cir.2000).

Accordingly, the court held Defendant should receive a two-level increase, pursuant to USSG § 3B1.3, because he abused a position of private trust. This brought Defendant's adjusted offense level under the advisory Sentencing Guidelines to **28.**

### E. Obstruction of Justice— USSG § 3C1.1

Fifth, the court decided whether Defendant should receive a two-level increase pursuant to USSG § 3C1.1 for obstruction of justice. The government bore the burden to prove an increase was warranted. *United States v. Vinton*, 429 F.3d 811, 818 (8th Cir.2005).

Section 3C1.1 provides:

> If (A) the defendant willfully obstructed or impeded, or attempted to obstruct or impede, the administration of justice during the course of the investigation, prosecution, or sentencing of the instant offense of conviction, and (B) the obstructive conduct related to (i) the defendant's offense of conviction and any relevant conduct; or (ii) a closely related offense, increase the offense level by 2 levels.

USSG § 3C1.1 (emphasis in original). "[P]roducing or attempting to produce a false, altered, or counterfeit document or record during an official investigation or judicial proceeding" constitutes obstruction of justice. *Id.* cmt. (n. 4(c)); *see, e.g., United States v. Martin*, 369 F.3d 1046, 1061 (8th Cir.2004) (holding backdating checks warranted obstruction of justice finding); *United States v. Callahan*, 981 F.2d 491, 496–97 (11th Cir.1993) (holding district court did not abuse its discretion in finding defendant obstructed justice, where defendant presented the court with a false document during discovery).

The government argued that Defendant obstructed justice because he presented a false document, Government Exhibit 813, to the government while the government was preparing for sentencing. In the alternative, the government argued that Defendant obstructed justice when he lied to Special Agent McGuire during a proffer interview in May of 2007.

### 1. Thompson Motors

In the course of its investigation of Defendant, the government discovered that Defendant sold two truck loads of H & W equipment and parts to Thompson Motors of Wykoff, Inc., in August of 2002, for $17,000. On August 16, 2002, Defendant directed Rod Thompson, the owner of Thompson Motors, to make the payment in two $8,500 checks, because Defendant wanted to avoid currency reporting requirements. Defendant also told Thompson to make each check out to "Sioux Falls Cartage," a defunct South Dakota corporation that Defendant previously owned. Defendant then took the checks and drove to an Illinois bank, where he exchanged the checks for cash. Unbeknownst to Defendant, the bank aggregated the amounts and reported the transaction to the IRS.

Prior to the Hearing, Defendant produced Exhibit 813 to the government. Exhibit 813 purports to be two invoices from Sioux Falls Cartage to Thompson Motors. The fax is addressed from Greg Hohnecker to Thompson. Each invoice is for $8500 in exchange for "new and used miscellaneous parts." The fax is dated August 16, 2002; the individual invoices are dated August 5, 2002 and August 7, 2002. The fax purports to explain that Defendant exchanged the checks from Thompson Motors for cash, because Sioux Falls Cartage did not have an account at the Illinois bank.

At the Hearing, Hohnecker, a former H & W mechanics supervisor, testified that he never worked for Sioux Falls Cartage. He testified that, although he worked with vendors as a part of his job for H & W, he never sent out invoices or faxes as a part of his job and had never seen Exhibit 813 in his life.

The court finds that Exhibit 813 is a false and forged document. Further, the

court finds that Defendant produced Exhibit 813 to the government during an official investigation or judicial proceeding. Defendant willfully obstructed and impeded and attempted to obstruct and impede the administration of justice during the course of the investigation, prosecution and sentencing of the instant offense of conviction. Such obstructive conduct related to Defendant's offense of conviction and any relevant conduct; the government was arguing that the transaction to Thompson Motors was evidence that Defendant warranted a sophisticated means enhancement.[17] Defendant also wanted to conceal the fact that he had structured a financial transaction to evade reporting requirements.

### 2. Post–Plea Proffer

■ In the alternative, the government argued that Defendant obstructed justice when he repeatedly lied to Special Agent McGuire during a proffer interview in May of 2007. *See* Gov't Ex. 712, *passim.* The court agrees. Defendant lied to Special Agent McGuire in at least two material respects. First, Defendant lied when he told Special Agent McGuire that when he signed the Schedules they were blank. Second, Defendant lied when he concocted an elaborate story about how John Carr gave him a ring and he had "no idea" why the check for the ring was made payable to "McCoy Repair" and drawn on a Solace check. In each of these two instances, Defendant was trying to minimize or escape responsibility for much of his relevant conduct. As a direct consequence, the government was forced to spend considerable time and energy refuting his lies. In repeatedly lying to Special Agent McGuire, Defendant "significantly obstructed or im-

peded the official investigation or prosecution of the instant offense." USSG § 3C1.1, cmt. (n. 4(g)).

### 3. Disposition

Accordingly, the court held Defendant should receive a two-level increase, pursuant to USSG § 3C1.1, because he obstructed justice. This brought Defendant's adjusted offense level under the advisory Sentencing Guidelines to **30**.

### F. Acceptance of Responsibility— USSG § 3E1.1

■ Sixth, the court decided whether Defendant was entitled to a two-level decrease pursuant to USSG § 3E1.1(a) for acceptance of responsibility. Defendant bore the burden to prove he was entitled to a downward adjustment for acceptance of responsibility. *United States v. Honken,* 184 F.3d 961, 968 (8th Cir.1999).

Section 3E1.1 provides:

(a) If the defendant clearly demonstrates acceptance of responsibility for his offense, decrease the offense level by **2** levels.

USSG § 3E1.1(a) (emphasis in original). Only in extraordinary cases is a defendant entitled to a downward adjustment for acceptance of responsibility after the court has found that he obstructed justice. *See Honken,* 184 F.3d at 967–68 (citing USSG § 3E1.1 cmt. (n. 4)).

To determine whether a defendant qualifies for acceptance of responsibility, the court may consider whether that defendant "truthfully admit[s] the conduct comprising the offense[ ] of conviction, and truthfully admit[s] or not falsely den[ies] any additional relevant conduct for which the defendant is accountable...." USSG § 3E1.1, cmt. (n. 1(a)). Although a defen-

---

**17.** To avoid double-counting, the court did not consider the fax for purposes of the so- phisticated-means enhancement.

dant is not required to volunteer relevant conduct to obtain acceptance of responsibility, "a defendant who falsely denies, or frivolously contests, relevant conduct that the court determines to be true has acted in a manner inconsistent with acceptance of responsibility." *Id.*

The court found Defendant did not meet his burden to prove he clearly demonstrated acceptance of responsibility. The court recognized that Defendant pled guilty to Counts 11 and 12 and admitted a factual basis for those offenses in the stipulation of facts to the Plea Agreement. The mere act of pleading guilty, however, does not entitle a defendant to acceptance of responsibility. *United States v. Byrd,* 76 F.3d 194, 196 (8th Cir.1996). Considering the totality of the circumstances, this is not an "extraordinary case" in which both an upward adjustment for obstruction of justice and a downward adjustment for acceptance of responsibility apply. *See Honken,* 184 F.3d at 970 ("[W]hen the Commission refers to an 'extraordinary case,' it means a situation that is extremely rare and highly exceptional. Thus the terms of § 3E1.1, application note 4 require an obstructive defendant to do more than merely cease obstructive conduct and plead guilty to the underlying offense to earn a downward adjustment for acceptance of responsibility."). Indeed, here Defendant has not even admitted his obstructive conduct.

In any event, Defendant is not entitled to acceptance of responsibility, because he repeatedly and frivolously denied relevant conduct throughout this sentencing. Defendant has tried to shift the blame for his offense to others, such as Galley Smith, and denies the full extent of the involvement in his scheme. *U.S. v. Collier,* 413 F.3d 858, 861 (8th Cir.2005). For example, Defendant denies his true involvement with STRAC. Defendant also entered an

"eleventh hour" guilty plea. *See* USSG § 3E1.1, cmt. (n. 1(h)) (stating that district court may consider the "timeliness" of a defendant's guilty plea in deciding whether to grant a reduction for acceptance of responsibility); *see, e.g., United States v. Wattree,* 431 F.3d 618, 623 (8th Cir.2005) (holding district court clearly erred in granting defendant acceptance of responsibility, in part because the defendant pled guilty to one charge in an "untimely" manner, i.e., "only one week before trial"). Further, Defendant denied criminal intent for his crimes through his attorney in his Sentencing Memorandum. *See, e.g., United States v. Ervasti,* 201 F.3d 1029, 1043–44 (8th Cir.2000) (holding district court did not clearly err in denying a reduction for acceptance of responsibility to a defendant who repeatedly denied intent to defraud).

Accordingly, the court found Defendant was not entitled to a two-level downward adjustment for acceptance of responsibility. USSG § 3E1.1. Defendant's adjusted offense level under the advisory Sentencing Guidelines remained at **30**.

### G. Pre–Departure Advisory Sentencing Guidelines Range

Defendant was a **Criminal History Category I.** PSIR at ¶ 108. Accordingly, with an adjusted offense level of 30, Defendant's pre-departure advisory Sentencing Guidelines range was 97 to 121 months of imprisonment. Because the statutory maximum in this sentencing was ten years, however, such range effectively became **97 to 120 months of imprisonment.**

### VII. TRADITIONAL DEPARTURES

Defendant argued that he should receive a downward departure from his pre-departure advisory Sentencing Guidelines range, and the government argued that Defendant should receive an upward departure. After setting forth the general law of de-

partures, the court examined each provision, in turn.

### A. General Principles

■■■ In discussing the propriety of departures generally, the Eighth Circuit Court of Appeals recently summarized:

> Departures are appropriate if the sentencing court finds that there exists an aggravating or mitigating circumstance "of a kind, or to a degree, not adequately taken into consideration by the Sentencing Commission in formulating the guidelines that, in order to advance the objectives set forth in 18 U.S.C. § 3553(a)(2), should result in a sentence different from that described." USSG § 5K2.0. The guidelines provide that sentencing courts [are] to treat each guideline as carving out a "heartland," a set of typical cases embodying the conduct that each guideline describes. When a court finds an atypical case, one to which a particular guideline linguistically applies but where conduct significantly differs from the norm, a court may consider whether a departure is warranted. USSG § 1A1.1, cmt. n. 4(b).

United States v. Chase, 451 F.3d 474, 482 (8th Cir.2006) (formatting altered). Defendant bore the burden to prove that a downward departure was appropriate, and the government bore the burden to prove that an upward departure was appropriate. Compare Flores, 362 F.3d at 1037, with Lussier, 423 F.3d at 843.

■■■ The decision whether to depart from the advisory Sentencing Guidelines rests within the sound discretion of the district court. See, e.g., United States v. Thin Elk, 321 F.3d 704, 707–08 (8th Cir. 2003) (reviewing for an abuse of discretion "because the decision to depart embodies the traditional exercise of discretion by the sentencing court" (citations and internal quotation marks omitted)). However, "[b]efore a departure is permitted, certain aspects of the case must be found unusual enough for it to fall outside the heartland of cases...." Koon v. United States, 518 U.S. 81, 98, 116 S.Ct. 2035, 135 L.Ed.2d 392 (1996). The district court must "carefully articulate the reasons for departure, particularly where the waters are unchartered." United States v. Reinke, 283 F.3d 918, 925–26 (8th Cir.2002).

"The district court is not left adrift ... in determining which cases fall within and which cases fall outside of the 'heartland.' " McCart, 377 F.3d at 877 (citing Koon, 518 U.S. at 94, 116 S.Ct. 2035). In USSG § 5K2.1 et seq., "[t]he Sentencing Commission enumerated some of the factors that it believed were not adequately accounted for in the formulation of the Guidelines and might merit consideration as aggravating or mitigating circumstances." Thin Elk, 321 F.3d at 708 (citing USSG § 5K2.0).

### B. Downward Departure— USSG § 5K2.0

■■■ Defendant argued that he was entitled to a downward departure, pursuant to USSG § 5K2.0, because he has cooperated with the government and the bankruptcy trustee, guaranteed and paid back funds to H & W's creditors, and "at great personal expense, expended time and funds to determine the actual whereabouts of funds claimed by the government to have been improperly removed from H & W to the detriment of creditors and provided [a] paper trail to the government tracing the whereabouts of those funds." Motion at 2–3. Defendant contends that his advisory Sentencing Guidelines range did not take into account these efforts.

For the reasons stated in Part IV.B supra, the court did not believe Defendant's efforts were in good faith. Rather,

the court believed Defendant continued to perpetuate his fraud with the knowing assistance of Lex, Schueller and possibly others. The court declined to reward Defendant's continuing fraudulent actions with a downward departure.

Accordingly, the court denied the Motion to the extent Defendant sought a downward departure, pursuant to § 5K2.0.

### C. Upward Departures

To the contrary, the court found an upward departure to an advisory Sentencing Guidelines range of the statutory maximum of 120 months was appropriate, pursuant to USSG §§ 5K2.3, .5, .9 and .21. There were at least four aggravating factors that removed this case from the "heartland." Each factor was, in itself, a sufficient reason to depart upward to the statutory maximum.

### 1. USSG § 5K2.3—Extreme Psychological Injury

In full, § 5K2.3 provides:

> If a victim or victims suffered psychological injury much more serious than that normally resulting from commission of the offense, the court may increase the sentence above the authorized guideline range. The extent of the increase ordinarily should depend on the severity of the psychological injury and the extent to which the injury was intended or knowingly risked.
>
> Normally, psychological injury would be sufficiently severe to warrant application of this adjustment only when there is a substantial impairment of the intellectual, psychological, emotional, or behavioral functioning of a victim, when the impairment is likely to be of an extended or continuous duration, and when the impairment manifests itself by physical or psychological symptoms or by changes in behavior patterns. The court should consider the extent to which such harm was likely, given the nature of the defendant's conduct.

USSG § 5K2.3.

The effects of Defendant's actions upon the psychological and emotional functioning of H & W's former employees cannot be understated. These victims suffered psychological injury to a degree not found in the garden-variety bankruptcy fraud case. An upward departure is clearly appropriate here.

Betty Mountain, H & W's former terminal manager in Mason City, Iowa, credibly testified at the Hearing. Mountain testified at length about the financial and emotional harm that Defendant's actions caused her and other former H & W employees. Scores of employees lost paychecks. Others, including Mountain herself, have lost significant portions of their pensions. Mountain testified that she receives little more than half of her promised pension. She would have received less, if not nothing, had the federal Pension Benefit Guaranty Corporation not assumed some of H & W's obligations.

Mountain also offered compelling testimony about the truly terrifying events of June 12, 2002, the date Defendant plunged H & W into bankruptcy. That morning, Defendant called Mountain and others in a conference call to reassure them about late paychecks. In the afternoon, Lex sent Mountain a fax at Defendant's behest. The fax ordered Mountain to make an inventory of all H & W property at the Mason City terminal, load the property into a trailer and drive the trailer to headquarters in Dubuque.

Mountain did not trust Defendant or Lex and refused to follow the faxed order. When Defendant learned of Mountain's refusal, he ordered his subordinates to shut

down the Mason City terminal. Defendant's subordinates-driving Solace trucks-threatened to run Mountain over if she did not let them into the locked terminal. Once inside, Defendant's subordinates proceeded to pillage the terminal. These events undoubtedly caused significant and lasting psychological harm to Mountain and any other H & W employees present at the time.

Mountain also credibly testified at length about the impact of Defendant's fraud upon her coworkers. H & W's bankruptcy clearly had lasting psychological effects upon H & W's employees, who were thrust into debt and suffered much stress as a consequence. Mountains' testimony about her coworkers' suffering corroborates the unsworn statements of some of the creditors/former employees who spoke at the § 341 Meeting. The statements of these creditors/former employees are telling and detail how Defendant's actions substantially impaired the psychological and emotional functioning of many persons. One creditor/former employee, Pam Lodge, stated:

> I'm sitting here with $1500 on my credit card and another ... $11,000 that [Defendant] owes me.[18] I put my house up for sale and my husband resigned from a 25–year job because he wanted me to take a move to Dubuque [to work for H & W].... I've got two babies at home with no insurance because he wanted us to move. So yes, we're a little angry.

Gov't Ex. 6, at 78.

Defendant's conduct towards H & W and his disregard of his fiduciary duties as CEO was brazen. There is little doubt that he knowingly risked if not actually intended that his victims suffer the extreme psychological harm they did suffer.

Defendant significantly impacted the life savings and retirement plans of scores of untold employees; the attendant psychological and emotional harm is unlikely to disappear, especially for senior citizens like Mountain who have little to no time to recoup their losses. Defendant's advisory Sentencing Guidelines only takes into account the economic loss that Defendant intended to inflict and does not account for any of this extreme psychological injury.

Accordingly, the court held that an upward departure to the statutory maximum of 120 months of imprisonment was appropriate, pursuant to § 5K2.3. *Compare United States v. Astorri*, 923 F.2d 1052 (3d Cir.1991), *with United States v. Pelkey*, 29 F.3d 11 (1st Cir.1994) *and United States v. Mandel*, 991 F.2d 55 (2d Cir.1993).

### 2. USSG § 5K2.5—*Property Damage or Loss*

In full, § 5K2.5 provides:

> If the offense caused property damage or loss not taken into account within the guidelines, the court may increase the sentence above the authorized guideline range. The extent of the increase ordinarily should depend on the extent to which the harm was intended or knowingly risked and on the extent to which the harm to property is more serious than other harm caused or risked by the conduct relevant to the offense of conviction.

USSG § 5K2.5.

In the present case, Defendant caused significant loss that the advisory Sentencing Guidelines do not take into account, namely, the fact that the federal government now has to cover significant portions of the pensions upon which H & W has defaulted. An upward departure under this section does not constitute im-

---

**18.** The bankruptcy schedules only disclose that H & W owes Lodge $4,200.

permissible double counting with the court's upward departure pursuant to § 5K2.3, because the § 5K2.3 upward departure was warranted for the extreme psychological injury Defendant knowingly risked, not the mere fact that Defendant knowingly risked the lost pensions themselves.

Accordingly, the court held that, even if it had not already departed upward, pursuant to § 5K2.3, an upward departure to the statutory maximum of 120 months of imprisonment was nonetheless appropriate, pursuant to § 5K2.5.

### 3. USSG § 5K2.9—Criminal Purpose

In full, § 5K2.9 provides:

> If the defendant committed the offense in order to facilitate or conceal the commission of another offense, the court may increase the sentence above the guideline range to reflect the actual seriousness of the defendant's conduct.

USSG § 5K2.9.

 The court found that an upward departure under § 5K2.9 was appropriate. Defendant made false statements in the Bankruptcy Court in order to facilitate and conceal the complex insider transactions he had made while CEO of H & W. Although these transactions were disguised as part of a complex shell game, they amounted to nothing more than outright theft from H & W and its creditors. It was this embezzlement that Defendant intended to conceal when he lied throughout the bankruptcy proceedings.

The court recognizes that, in *United States v. Robertson,* 324 F.3d 1028, 1032 (8th Cir.2003), the Eighth Circuit Court of Appeals held that an upward departure pursuant to § 5K2.9 was not appropriate in a 18 U.S.C. § 1001 prosecution. In *Robertson,* the court held that "a case in which the defendant knowingly lies to a federal agent regarding a fact material to the agent's investigation [does not] fall[ ] outside the heartland of such offenses merely because the defendant told the lie to conceal aspects of the offense for which he was arrested." 324 F.3d at 1032 (rejecting *United States v. LeMaster,* 54 F.3d 1224, 1232 (6th Cir.1995)). *Robertson* is distinguishable, because Defendant did not make a false statement in response to law enforcement questioning, in violation of § 1001. Unlike § 1001, the "heartland" of a § 152(3) offense does not include the commission of other offenses. In other words, whereas the typical false statement to a federal law enforcement agent accompanies an underlying crime that the defendant intends to shield, the typical bankruptcy fraud offense does not include the commission of an underlying crime.

Accordingly, the court held that, even if it had not already departed upward, pursuant to § 5K2.3 or § 5K2.5, an upward departure to the statutory maximum of 120 months of imprisonment was nonetheless appropriate, pursuant to § 5K2.9.

### 4. USSG 5K2.21—Dismissed and Uncharged Conduct

In full, USSG § 5K2.21 states:

> The court may depart upward to reflect the actual seriousness of the offense based on conduct (1) underlying a charge dismissed as part of a plea agreement in the case, or underlying a potential charge not pursued in the case as part of a plea agreement or for any other reason; and (2) that did not enter into the determination of the applicable guideline range.

USSG § 5K2.21 (emphasis in original).

 The court found that an upward departure pursuant to § 5K2.21 was appropriate. Defendant committed numerous other crimes that the government did

not pursue. First, Defendant repeatedly lied in his bankruptcy petition and at the § 341 Meeting, in violation of 18 U.S.C. § 152(3). The specifics of these lies are set forth in the court's factual findings in Part IV *supra*. Second, Defendant structured a financial transaction, in violation of 31 U.S.C. § 5324, when he directed Thompson to write two checks in the amount of $8500. The details of this crime are set forth in Part VI.E, *supra*. Third, Defendant made false statements to law enforcement officers, in violation of § 1001. Before the grand jury indicted Defendant, Defendant lied and told Special Agent McGuire (1) he never met with Attorney Harold White to incorporate EHI; (2) he was never an officer of Solace; (3) he did not know what STRAC was; and (4) he did not know who the officers of Nationwide were. None of the foregoing crimes themselves entered into the court's determination of the applicable guideline range.[19]

Accordingly, the court held that, even if it had not already departed upward, pursuant to § 5K2.3, § 5K2.5 or § 5K2.9, an upward departure to the statutory maximum of 120 months of imprisonment was nonetheless appropriate, pursuant to § 5K2.21.

### D. Final Advisory Sentencing Guidelines Range

After all applicable adjustments and departures, Defendant's **final advisory Sentencing Guidelines range became 120 months.**

### VIII. SENTENCE AND RESTITUTION

The court decided two non-advisory Sentencing Guidelines range issues. First, the court considered all of the factors at 18 U.S.C. § 3553(a) and determined Defen-

dant's sentence. The court then decided whether to impose restitution.

### A. 18 U.S.C. § 3553(a)

■ In pertinent part, § 3553(a) directs the court to consider the following facts in determining the particular sentence to be imposed:

(1) the nature and circumstances of the offense and the history and characteristics of the defendant;

(2) the need for the sentence imposed-

(A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;

(B) to afford adequate deterrence to criminal conduct;

(C) to protect the public from further crimes of the defendant; and

(D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner;

(3) the kinds of sentences available;

(4) the kinds of sentence and the sentencing range established for ... the applicable category of offense committed by the applicable category of defendant as set forth in the guidelines ... issued by the Sentencing Commission....

(5) any pertinent policy statement ... issued by the Sentencing Commission....

(6) the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; and

(7) the need to provide restitution to any victims of the offense.

18 U.S.C. § 3553(a). Further, the court must "impose a sentence sufficient, but not

---

**19.** For example, the court did not rely upon these pre-Indictment lies in finding that De-

fendant obstructed justice for purposes of USSG § 3C1.1.

greater than necessary, to comply with the purposes set forth in paragraph (2)" above. *Id.* However, the court need not explicitly set forth its analysis of all of the § 3553(a) factors here. *See, e.g., United States v. Lamoreaux,* 422 F.3d 750, 756 (8th Cir. 2005) (quoting *United States v. Crosby,* 397 F.3d 103, 113 (2d Cir.2005)) ("Nothing in § 3553(a) or in the *Booker* remedy opinion requires 'robotic incantations' that each statutory factor has been considered.").

■ The court's discussion of many of the factors militating in favor of a sentence at the very top of the statutory range of zero to 120 months of imprisonment are already set forth in the court's discussion of Defendant's advisory Sentencing Guidelines range, including the court's discussion of the appropriateness of upward departures. Although Defendant has no criminal history, his conduct was very serious and he poses a high risk to re-offend. Considering all of these factors, **the court sentenced Defendant to 120 months of imprisonment.**

In the event that the court was mistaken about the propriety of all of its upward departures and Defendant's advisory Sentencing Guidelines range were 97 to 120 months (based upon a total adjusted offense level of 30 and a Criminal History Category I) instead of 120 months of imprisonment, the court would nonetheless have imposed a sentence of 120 months of imprisonment. A sentence below 120 months of imprisonment would not adequately reflect the seriousness of Defendant's offense, promote respect for the law or provide just punishment. It would give short shrift to all the people Defendant intended to hurt, the nonmonetary harm his victims suffered, Defendant's criminal purpose and the various dismissed and uncharged conduct.

### B. *Restitution*

■ Second, the court decided whether Defendant must pay restitution. Defendant did not dispute the amount of restitution that the government claimed was due and owing to the bankruptcy estate, *i.e.,* $1,722,717.61. Sentencing Memorandum (docket no. 82), at 57–58 (citing PSIR ¶ 150). Rather, Defendant's only argument in his Sentencing Memorandum was that "[a]t the plea[,] discussions were held and agreement was entered into that[,] because of the nature of the statements made, no restitution would be due from this Defendant." Sentencing Memorandum (docket no. 79), at 34. The court has reviewed the transcript of the plea hearing and the text of the Plea Agreement, however, and there is no evidence of any representation or promise to Defendant that he would not have to make restitution to his victims. Accordingly, the court ordered Defendant to make restitution in the amount of $1,722,717.61 to H & W's bankruptcy estate in *H & W Motor Express.* 18 U.S.C. § 3663A(c)(1)(A)(ii).

### IX. *CONCLUSION*

After all applicable adjustments and departures, the court found that Defendant's final advisory Sentencing Guidelines range was 120 months of imprisonment. After considering all of the factors at 18 U.S.C. § 3553(a), the court found that a sentence of 120 months of imprisonment was appropriate. The court also ordered Defendant to pay restitution in the amount of $1,722,717.61.

**IT IS SO ORDERED.**